JOHN FOREMAN AND GARY RUNGE,      )
                                         )      **Case No. 3:11-cv-01124**
         **Plaintiffs,**           )      **Judge Aleta A. Trauger**
                                         )
**v.**                                         )
                                         )
**FIVE STAR FOOD SERVICE, INC.,**      )
                                         )
         **Defendant.**           )

## MEMORANDUM

Plaintiff John Foreman has filed a Motion for Partial Summary Judgment (Docket No. 37), to which defendant Five Star Food Service, Inc. ("Five Star") filed a Response in opposition (Docket No. 38), and the plaintiffs filed a Reply (Docket No. 44). Five Star has filed a Motion for Summary Judgment (Docket No. 30), to which Foreman and plaintiff Gary Runge filed a Response in opposition (Docket No. 39), and Five Star filed a Reply (Docket No. 43). For the reasons stated herein, Foreman's Motion for Partial Summary Judgment will be granted and the defendants' Motion for Summary Judgment will be denied.

## BACKGROUND

Five Star is a Delaware corporation with a principal place of business in Chattanooga, Tennessee. It is one of the largest full-line vending, coffee service, and food services providers in the United States. Five Star has a branch location in Tennessee that services clients in Middle Tennessee. This case involves two factually distinct claims against Five Star. First, plaintiffs John Foreman and Gary Runge, who worked for Five Star during the relevant time frame, claim that Five Star owes them unpaid overtime compensation under § 216(b) the Fair Labor Standards

1

Act ("FLSA").[1]  Second, Foreman claims that, in violation of Tennessee law, Five Star

terminated him in retaliation for intending to comply with a lawful trial subpoena.  Because these

claims are factually and legally distinct, the court will address the relevant facts and law in

separate sections relative to each claim.[2]

──────────────

[1]In the Complaint, Foreman filed this case seeking to certify a collective action under the FLSA.  (Docket No. 1.)  After the court granted Foreman's unopposed Motion for Expedited Court-Supervised Notice (Docket No. 16), only one individual, Gary Runge, chose to "opt in" as a party plaintiff with respect to the FLSA claim.  (Docket No. 18.)  For reasons that are unclear, Foreman filed the instant Motion for Partial Summary Judgment only on his own behalf.

[2]In support of its Motion for Summary Judgment, Five Star filed a Statement of Undisputed Facts (Docket No. 30, Attachment No. 2), supported by excerpts from the depositions of Foreman, Peggy Russell (Five Star Human Resources Director), and Mark Stephanos (Five Star Vice President), certain discovery responses by Five Star, and declarations from Tom Nelson (President of Vistar of Tennessee), Grayson Wood (Docket No. 34 (late-filed)) (Five Star Director of Risk Management during relevant time frame), and Jean Bouchard (Docket No. 35 (late-filed)) (Five Star Chief Financial Officer)).  In support of his Motion for Partial Summary Judgment, Foreman filed a timely Statement of Undisputed Facts (Docket No. 32), supported by excerpts from the depositions of Foreman and Russell, along with the Declaration of John Foreman (*id.*, Attachment No. 4.).  In opposition to Five Star's Motion for Summary Judgment, Foreman filed, one day late, a Response to Five Star's Statement of Undisputed Facts (Docket No. 40), which was supported by, *inter alia*, excerpts from the depositions of Foreman, Russell, and Stephanos, and the Foreman Declaration (identical).  Five Star filed a Response to Foreman's Statement of Additional Facts with respect to Five's Star Motion for Summary Judgment (Docket No. 43, Attachment No. 1), and a Response to Foreman's Statement of Undisputed Facts relative to his Motion for Summary Judgment (Docket No. 38, Attachment No. 1), supported by the Declaration of James McDaniel (*id*, Attachment No. 4).

Five Star suggests that the court should disregard certain factual materials and objections filed by Foreman because they were filed one day late.  Although late filings are of course disfavored in this court, any prejudice to Five Star was *de minimis*, particularly where the late-filed Foreman Declaration was identical to the declaration that Foreman had originally (and timely) filed in support of his Motion for Summary Judgment.  Also, Five Star sought no lesser relief, such as additional time to file a Reply.  Finally, Five Star itself filed late affidavits, including the Bouchard Declaration that Five Star filed five days after the applicable deadline.  (*See* Docket No. 35 (filed Apr. 16, 2013).)  Therefore, under the circumstances, the court rejects Five Star's request and will consider all of the materials filed by both parties, late-filed or otherwise, in identifying the relevant facts at issue.

**SUMMARY JUDGMENT STANDARD**

"[O]n cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

**FLSA CLAIM**

I.    **Relevant Facts**

At issue in this lawsuit are two types of Five Star employees with similar responsibilities: vending route drivers and Avanti Market merchandisers. Vending route drivers are responsible for servicing vending machines located at customer locations along a designated route. The drivers are responsible for filling the vending machine to a proper inventory level, collecting money from the machines, performing routine sanitation and cleaning of the machines, and, in most relevant part, loading and transporting their trucks with products to stock the machines. In January 2011, Five Star also obtained the rights to a new service called "Avanti Markets," which are essentially automated convenience stores maintained at a client's facility. As with vending route drivers, Avanti Market merchandisers serviced Avanti Markets along a designated route and were responsible for ensuring that food items were maintained and rotated appropriately, that the markets were safe and clean, and that the markets were stocked only with fresh products.

In the regular course of business, vending route drivers and merchandisers transported

3

snack foods and other goods from Five Star's Nashville warehouse to the vending machines and Avanti Markets in Middle Tennessee during the relevant time frame. Because of a business relationship between Five Star and a company called Vistar of Tennessee, some of the products that Five's Star vending route drivers and merchandisers used to stock the machines and markets were originally manufactured and packaged outside of Tennessee. Vistar of Tennessee is a division of Performance Food Group, located in Memphis, Tennessee. Vistar of Tennessee maintains a distribution center in Memphis (among 20 distribution centers across the country), from which it distributes candy, snacks, beverages, and other convenience food items to clients, including Five Star. With respect to Vistar of Tennessee's Memphis warehouse, Vistar of Tennessee purchases and ships into Tennessee products manufactured and packaged in at least five states outside Tennessee. With respect to its contractual relationship with Five Star, Vistar of Tennessee then "sells and distributes" those products to Five Star and "regularly delivers" the products to Five Star's Nashville warehouse, by which point Five Star owns the products.[3]

In anticipation of servicing machines along their designated routes, Five Star's vending route drivers and merchandisers load products onto their trucks at Five Star's Nashville warehouse. Utilizing interstate highways (albeit only within Tennessee), the drivers and merchandisers then transport these products to locations along routes within Middle Tennessee. On a daily basis, these products include at least some products purchased from Vistar of

_____

[3]The affidavits filed by the defendants are somewhat vague as to the chain of title to these products. The affidavits do not specify when title transfers from the out-of-state manufacturers to Vistar of Tennessee or when title transfers from Vistar of Tennessee to Five Star – *i.e.*, whether title passes at the point of shipment or at the point of destination. Also, the defendants have not filed copies of the relevant contracts or provided detailed descriptions of the contractual relationships between (a) the out-of-state manufacturers and Vistar of Tennessee, (b) Vistar of Tennessee and Five Star, and (c) Five Star and its customers.

4

Tennessee – *i.e.*, products originally manufactured and packaged outside of Tennessee. The vending route drivers and merchandisers, who serviced accounts in Middle Tennessee, were never expected to transport these products outside of Tennessee.

In sum, based on the record, the food products at issue travel as follows: (1) out-of-state shippers manufacture and package food products outside of Tennessee; (2) Vistar of Tennessee, based in Tennessee, either ships or has the manufacturers ship those products across state lines into Vistar of Tennessee's Memphis warehouse/distribution center; (3) pursuant to an arm's length contractual relationship with Five Star (one of Vistar's multiple customers and one of Five Star's multiple suppliers), Vistar of Tennessee sells some of those products to Five Star and delivers them to Five Star's Nashville warehouse on a "regular basis"; and (4) on a daily basis, Five Star's vending route drivers and merchandisers load their trucks with products that include at least some products originally produced outside of Tennessee that, by that point in the chain of distribution, Vistar of Tennessee had sold and transported from Vistar of Tennessee's Memphis warehouse to Five Star's Nashville warehouse.

The record does not specify what volume of Vistar of Tennessee's business is comprised of purchases by Five Star; however, given that Vistar of Tennessee sells to multiple "retailer[s], vendors, and other customers" from the Memphis warehouse (Nelson Decl. ¶ 5), Five Star's business is necessarily a fraction of Vistar of Tennessee's sales and deliveries from the Memphis warehouse. The record does not indicate whether Vistar of Tennessee and Five Star operate pursuant to a requirements contract or whether Five Star simply purchases products from Vistar of Tennessee through individual (albeit regular) transactions as needed. Furthermore, aside from the fact that Vistar of Tennessee purchases goods from out-of-state manufacturers, the record

5

contains no specific information about the contractual relationship between Vistar of Tennessee and those producers or the producers' intent in selling and/or shipping the goods to Vistar of Tennessee. At any rate, Nelson, Vistar of Tennessee's President, avers that Vistar of Tennessee distributed out-of-state products to Five Star from the Memphis warehouse "with the understanding, agreement, and intent that Five Star [] will sell the products to its customers/consumers."[4]

On September 6, 2011, Five Star hired Foreman as a vending route driver. For approximately four weeks, Foreman worked in this role and received $500 per week, regardless of the number of hours worked. Five Star does not dispute that Foreman worked more than forty hours per week as a vending route driver. In early October 2011 (apparently on or about October 3), Five Star transferred Foreman to an Avanti Markets merchandiser position, which Foreman held until Five Star discharged him on November 8, 2011. While working as a merchandiser, Foreman received a base wage of $12.50 and, to the extent he was able to record those hours, received an overtime premium for time worked over 40 hours. The parties dispute whether Foreman was able to record all of his overtime hours: Foreman testified that McDaniel required

---

[4]In Five Star's Statement of Undisputed Facts, Five Star represents that "Five Star of Tennessee purchased products from Vistar with the understanding, agreement, and intent that it would sell the products to its customers/consumers and that the products would be moving in interstate commerce at all times." (Docket No. 40 at p. 5; *see also* Bouchard Aff. ¶ 14 ("It is the intent of Five Star [] that the products sold and distributed to its customer [sic] will be moving in interstate commerce at all times.")) This self-serving representation is both an improper legal conclusion and an over-characterization of ¶ 9 of the Nelson Declaration, in which Nelson merely avers that Vistar of Tennessee understood and intended that Five Star would sell the products "to its [Five Star's] customers/consumers." As explained herein, (1) there is no indication that Vistar of Tennessee shipped products intrastate to Five Star with the intention that those products would thereafter cross state lines, and (2) Vistar of Tennessee's intent to ship the products across state lines pursuant to its separate relationships with out-of-state producers is distinct from Five Star's "intent" in moving the products intrastate from its Nashville warehouse to Five Star's customers within Tennessee.

6

him to work "off the clock" without recording certain overtime hours, whereas McDaniel avers that he never instructed Foreman "to perform work 'off the clock' or to clock out and continue working." (*See* Foreman Dep. at pp. 107, 114-116, and 225-30; McDaniel Declaration ¶ 9.) Foreman has moved for summary judgment on his FLSA claim, arguing that Five Star failed to pay him (1) any overtime at all with respect to his four weeks of work as a vending route driver and (2) for unrecorded hours with respect to his five weeks of work as a merchandiser.[5] In response, Five Star (1) argues that Foreman is not entitled to demand overtime, because Foreman's employment falls within the so-called "Motor Carrier Act" ("MCA") exemption from the FLSA's overtime requirements; and (2) disputes Foreman's contention that he was forced to work off the clock while working as a merchandiser.[6]

## II.    FLSA and the Motor Carrier Exemption

### A.    Standard to Justify an Exemption

Subject to certain enumerated exemptions, the FLSA requires covered employers to pay overtime wages to employees who work more than 40 hours per week. *See* 29 U.S.C. § 207. One of these exemptions, commonly referred to as the "Motor Carrier Act exemption," is contained in FLSA § 13(b)(1). *See id.* § 213(b)(1).

---

[5]During the relevant time frame, Runge similarly was employed as a vending route driver and later as an Avanti market merchandiser. Runge has not moved for summary judgment; nor has Foreman moved on behalf of the class of two plaintiffs.

[6]With respect to unpaid overtime hours that Foreman claims to have worked as a merchandiser, the nature of the parties' dispute is not clear. Foreman did not bring a contract claim, although it appears that Five Star did pay overtime hours to its merchandisers. At any rate, Foreman's Complaint specified that he sought recovery for unpaid overtime hours he worked as a merchandiser. Because the court finds, for the reasons stated herein, that the FLSA overtime provisions applied to Five Star's vending route drivers and to its merchandisers during the relevant time frame, the amount of hours that Foreman actually worked as a merchandiser – which the parties dispute – will be relevant to determining Foreman's damages.

7

FLSA exemptions must be "narrowly construed against employers and are to be withheld except as to persons 'plainly and unmistakably within their terms and spirit.'" *Auer v. Robbins*, 519 U.S. 452, 462, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960)).  Subject to that standard, the burden is on the defendant to show that the exemption applies.  *Douglas v. Argo-Tech. Corp.*, 113 F.3d 67, 69 (6th Cir. 1997).  Thus, here, Five Star has the burden to show that Foreman "plainly and unmistakably" falls within the FLSA's Motor Carrier Act exemption.

**B.     The Motor Carrier Act and "Interstate Commerce"**

1.     <u>MCA Definition of Interstate Commerce</u>

Under the Motor Carrier Act ("MCA"), 49 U.S.C. § 31502, the Secretary of Transportation has the power to establish qualifications and maximum hours of service for certain types of employees engaging in the carriage of interstate goods and passengers.  The FLSA exempts from its coverage any employees "with respect to whom the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the provisions of [MCA § 31502]."  *Id*. at § 213(b)(1).  The parties agree that the § 213(b)(1) exemption applies if the Secretary of Transportation "has the power" to regulate the employee in question, regardless of whether the Secretary actually has exercised that power.  *See Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 410 (6th Cir. 1970) ("If Appellees are within the Commission's power, as defined in the MCA, they are exempted from the maximum hours provisions of the FLSA and not entitled to recover overtime."); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181 n.2 (11th Cir. 1991) (citing *Galbraith v. Gulf Oil Corp.*, 413 F.2d 941, 944 n.4 (5th Cir. 1969)).  Here, the parties do not contend that the Secretary of

8

Transportation actually regulated Foreman's activities under the MCA. Therefore, the question here is whether Foreman's activities as a vending route driver and merchandiser were within the Secretary of Transportation's power to regulate, as defined by the MCA.

As a general matter, the MCA authorizes the Secretary of Transportation to regulate the transportation of materials "between a place in . . . (A) a State and a place in another State; [or] (B) a State and another place in the same State through another State[.]" 49 U.S.C. § 13501(1)(A) and (B). The parties agree that, to fall within the MCA's jurisdiction, the employee must (1) be employed by a "motor carrier" or "motor private carrier" as defined by the MCA (*see* 49 U.S.C. §§ 13102(13) and (15)); (2) affect highway safety, 29 C.F.R. § 782.2(a); and (3) be involved in "interstate commerce" within the meaning of the MCA. *See Baez*, 938 F.2d at 181; *see also Baird*, 425 F.2d at 410. Because the court finds, for the reasons explained herein, that the plaintiffs were not engaged in "interstate commerce" within the meaning of the MCA, the court will simply assume, without deciding, that the other criteria for the exemption are met.

The meaning of "interstate commerce" within the MCA is narrower than the scope of "interstate commerce" under the Commerce Clause and different from the definition of "interstate commerce" under the FLSA. *Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 410 (6th Cir. 1970). As explained in *Baird*:

> While the parties have stipulated that they are engaged in interstate commerce for purposes of the FLSA, such stipulation does not necessarily require a conclusion that their activities were in "interstate commerce" for purposes of the MCA. The scope and meaning of "interstate commerce" in each Congressional Act presents a unique problem in which words derive vitality from the aim and nature of the specific legislation. Whereas the FLSA covers employees "engaged in commerce or in the production of goods for commerce," 29 U.S. 203, 207(a)(1), the MCA only covers employees actually 'part of a continuous movement in interstate commerce.' Whereas the former Act [the FLSA] would apply to employees "in the production of goods for commerce" even though such employees handled or

9

sold such goods prior to or after their actual "continuous movement" in interstate commerce, the MCA would not.

425 F.2d at 410 (case citations omitted). Federal courts, including the Supreme Court, have

developed a rich body of jurisprudence addressing whether a particular employee who transports

goods is engaged in "interstate commerce" (within the MCA's scope) or "intrastate commerce"

(outside the MCA's scope). Courts often attempt to ascertain "the shipper's fixed and persisting

intent at the time of shipment." *Baird*, 425 U.S. at 410-11 (quoting C.F.R. 782.7(b)(2)); *State of*

*Tex. v. U.S. of Am. & Interstate Commerce Comm'n*, 866 F.2d 1546, 1556 (5th Cir. 1989).[7]

Regardless as the Sixth Circuit recognized in *Baird*, courts cannot simply assume that the MCA

applies whenever an employee handles goods that, at some point in the chain of distribution, had

---

[7]In 1957 and 1992, the Interstate Commerce Commission, which was then charged with administering the MCA wage and hour provisions, issued policy statements containing objective factors designed to aid courts in determining whether certain shipments constituted interstate commerce under the MCA. *See* 29 C.F.R. 782.7(b)(2) (1971) (codifying 1957 policy statement) and 57 Fed. Reg. 19812 (1992). As Judge Posner aptly summarized in *Collins v. Heritage Wine Cellars*, 589 F.3d 895, 897 (7th Cir. 2009), these statements cumulatively articulated a multiplicity of factors, without providing guidance as to what weight to apply to any particular factor. *Id*. at 900 ("Attempting to base decision(s) on seventeen unweighted judicial criteria to be applied by generalist judges who are not told what the relevance of any of the criteria is but have to figure it out for themselves is unlikely to improve the prospects for objectively deciding whether a particular intrastate shipment should be deemed to be 'in commerce.' The multicriteria approach is likely to condemn the judges to wander forlornly in the untracked wilderness named 'totality of the circumstances,' a phrase found in many of the cases involving the Motor Carrier Act's exemptions for interstate transportation"). Also, it is unclear in the Sixth Circuit whether either or both sets of factors are relevant in light of developments subsequent to *Baird*. *See Musarra v. Digital Dish, Inc.*, 454 F. Supp. 2d 692, 708-711 (S.D. Ohio 2006) (providing detailed discussion of this issue). Here, neither Five Star nor the plaintiffs reference or specifically rely upon the (former) ICC factors. Instead, they argue about whether the holdings in certain federal cases and/or statements in other forms of regulatory authority, such as Department of Labor opinion letters, are analogous and persuasive with respect to the case-specific circumstances presented here.

10

moved in interstate commerce.[8]

        2.      <u>Cases Defining the Types of Intrastate Warehouse-to-Customer Shipments that Constitute "Interstate Commerce" Under the MCA</u>

Here, Five Star urges the court to take a broad view of the MCA's scope. Five Star relies on a host of cases holding that, where certain goods were produced out-of-state and subsequently shipped intrastate, the intrastate warehouse-to-customer leg of the journey fell with the Secretary of Transportation's regulatory power under the MCA. Of course, these cases are fact-dependent and generally fall into either of two categories, both of which are distinguishable from the circumstances presented here.

---

[8]Several early Supreme Court cases addressed the scope of the FLSA and held that it, too, did not reflexively apply to intrastate sales by a wholesaler that purchased the goods interstate, unless there was a "practical continuity of movement" between the interstate and intrastate legs of the journey. *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 63 S. Ct. 33, 87 L. Ed. 460 (1943) (where wholesaler purchased products interstate and briefly warehoused them before shipping intrastate to fill prior purchase orders, FLSA applied, even though the Court "cannot conclude that all phases of a wholesaler's business selling intrastate are covered by the [MCA] solely because it makes its purchases intrastate); *see also Higgins v. Carr Bros. Co.*, 317 U.S. 572, 63 S. Ct. 337, 87 L. Ed. 468 (1943) (in companion case to *Jacksonville Paper*, FLSA did not apply, where wholesaler shipped goods into warehouse and thereafter sold goods locally from the warehouse); *Atlantic Coast R. Co. v. Std. Oil Co. of Ky.*, 275 U.S. 257, 48 S. Ct. 107, 72 L. Ed. 270 (1927)("The reshipment of an interstate or foreign shipment does not necessarily establish a continuity of movement or prevent the shipment to a point within the same state from having an independent or intrastate character . . . .").

A number of courts have grafted the *Walling* "practical continuity of movement" test onto the MCA exemption, *see, e.g., Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (11th Cir. 1993), although, as the Sixth Circuit later clarified in *Baird*, the definitions of "interstate commerce" in the MCA and in the FLSA are different. *See Baird*, 425 U.S. at 410; *see also Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 259 n.5 (3d Cir. 2005 (Nygard, J., concurring in judgment) ("[T]he contours of interstate commerce under the Motor Carrier Act and the Fair Labor Standards Act are different. Thus, *Walling* has no bearing upon the scope of the Motor Carrier Act exemption. The Courts of Appeal relying upon the case to determine the scope of the exemption have done so in error."); *Ballou v. DET Distr. Co.*, No. 3-03:1055, 2006 WL 2035729, at *9 n.3 (M.D. Tenn. July 17, 2006). The court need not resolve this discrepancy here, except to point out that, notwithstanding the volume of legal authority concerning the MCA exemption, the relevant standards for its applicability merit clarification.

11

First, numerous courts have held that so-called "hub-and-spoke" shipments can fall within the MCA, even where the shipper briefly warehouses the products before shipping them to customers. *State of Tex.*, 866 F.2d at 1556. These cases generally involve the following broad fact pattern: a company (a) has specific customer orders, standing customer orders (such as a requirements contract), and/or a reasonably projected estimate of ongoing customer needs; (b) the company ships products across state lines to its in-state warehouse; and (c), after a brief period of storage at the warehouse, the company transfers the products to trucks at the warehouse and ships them to its customers to complete products sales.

For example, in *State of Texas*, a carpet manufacturer shipped carpets from its facility in Georgia to a warehouse that it owned in Texas, from which it transported carpets to customers in the Dallas-Fort Worth area. *Id.* at 1548-49. In relevant part, the manufacturer shipped some of the carpets from Georgia to Texas as "non-sidemarked," meaning that the manufacturer did not know at the time of shipment from Georgia specifically which customer in the Dallas-Fort Worth area would need it. *Id.* at 1549. The court observed that, among other things, (1) the carpet manufacturer acting as the out-of-state shipper itself determined the final in-state destination of the carpets; (2) all of the carpets warehoused at the Texas facility were manufactured out-of-state; and (3) the carpet manufacturer had designated the non-sidemarked carpets as "storage-in-transit." The Fifth Circuit reasoned as follows:

> It is well-settled that, in determining whether a particular movement of freight is interstate or intrastate or foreign commerce, the intention existing at the time the movement starts governs and fixes the character of the shipment. If the shipment comes to rest *within the state of origin* and the goods are thereafter disposed of *locally*, the interstate character of the shipment is lost, but temporary stoppage within the state, made necessary in furtherance of interstate carriage, does not change its character.

12

*Id.* at 1560 (emphasis in original). Based on this reasoning, the court held that, because the carpet manufacturer had the fixed intent to transport the carpets from its Georgia factory to its Texas customers (even as to anticipatory "non-sidemarked" carpets) from the point of shipment in Georgia, the fact that it utilized a local carrier to accomplish the last leg of the journey did not destroy its intent at the point of shipment. *Id.*

Similarly, in *Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 897 (7th Cir. 2009), the court considered whether employees who drove wine shipments from their employer's warehouse to wine retailers were subject to the MCA's motor carrier requirements. The employer, Heritage Wine Cellars, was a wine wholesaler that purchased wine directly from out-of-state producers and stored it in its in-state warehouse (in Illinois) after the wine crossed state lines. None of these shipments remained at the warehouse for long: Heritage shipped one-fourth of the wine to meet pre-existing orders (storing the wine at the warehouse only briefly before shipping it to retailers to meet those orders) and shipped the balance to meet projected customer demands, such that wine in each shipment generally turned over from the warehouse to retailers in less than a month. *Id.* at 898. Heritage controlled the wine and directed its movements on the entire journey from the state or country of origin of the wine to the retail stores in Illinois to which the plaintiffs transported the wine from the warehouse. *Id.* at 897. The Seventh Circuit found that Heritage's drivers were engaged in interstate commerce when they shipped the wine from the Illinois warehouse to Heritage's customers in Illinois, primarily because Heritage had shipped the products across state lines and warehoused them only temporarily before shipping the products intrastate to its own customers. *Id.* However, the court distinguished the circumstances presented from the following scenario, which would have been analogous to the

13

circumstances presented here:

> But suppose instead that Heritage shipped its wine to a wholesale distributor in a Chicago suburb, *title passed to the distributor when the wine arrived at the distributor's warehouse, and the distributor contracted to sell the wine to retail stores and delivered it to them in its own trucks*. The carriage of the wine from the warehouse to the stores would be classified as an *intrastate* shipment under the Motor Carrier Act even though the property shipped had originated outside the state.

*Id.* at 897 (emphases added); *see also Talton v. I.H. Caffey Distr'g Co., Inc.*, 124 F. App'x 760, 762-63 (4th Cir. 2005) (wholesaler purchased beer directly from out-of-state producers, had beer shipped to its in-state warehouse, and shipped beer from in-state warehouse to its customers in same state).

Second, numerous courts have found that an integrated company's intrastate shipments fall under the MCA, where the integrated company – acting through its affiliates – arranges for the interstate transport of goods to an in-state warehouse, from which the company's affiliate transports the goods to a designated customer within that state.

For example, in *Billings v. Rolling Frito-Lay Sales, LP*, 413 F. Supp. 2d 817, 821 (S.D. Tex. 2006), Frito-Lay manufactured snack food products outside of Texas and shipped some of those products to a distribution center it owned in Texas, for intended shipment to Texas-based customers by Rolling Frito-Lay Sales, LP ("Rolling Frito"), a company in which Frito-Lay was the general partner. *Id.* at 819, 819 n.1. Rolling Frito's sales representatives loaded inventory at the Frito-Lay distribution center in Texas and also collected inventory data from retailers, which information the representatives transmitted electronically back to Frito-Lay for inventory control purposes. *Id.* at 819. The district court found that, although the Rolling Frito sales representatives only transported Frito-Lay snack foods (produced outside of Texas) between the

14

Texas warehouse and local Texas retailers, those representatives were engaged in interstate commerce under the MCA. *Id.* at 822. In reaching this holding, the court observed that, *inter alia*, Frito-Lay owned the Texas warehouse that it supplied with interstate products, that no substantial modification of the products occurred at the warehouse, and that Frito-Lay shipped product to the warehouse to meet reasonable projected demand by its local customers in Texas. *Id.* at 821-22. In most relevant part, as in *Collins*, the court specifically distinguished the circumstances in *Billings* from the type of case presented here: "This is not a case in which the [sales representatives] are independent contractors who purchase the product from Frito-Lay for resale to retailers. *Frito-Lay and its affiliated companies retain control over the product for its entire journey*." *Id.* at 822 (emphasis added); *see also Musarra v. Digital Dish, Inc.*, 454 F. Supp. 2d 692, 706 (S.D. Ohio 2006) (technicians for local subsidiary of DISH Network were covered by the MCA, where DISH Network shipped goods interstate to its subsidiary's distribution center and subsidiary's technicians shipped goods to DISH Network's (*i.e.*, its parent company's) designated customers); *Bilyou v. Dutchess Beer Distributors*, 300 F.3d 217, 224-25 (2d Cir. 2002) (where driver picked up empty containers from retailers and delivered them to corporate affiliate's facility in same state, driver was engaged in "interstate commerce" because his company and its affiliate intended product to be transferred out of state).

    In both types of cases, courts appear to have focused on the issue of control, namely whether (a) the company shipping products across state lines controlled the ultimate local destination of the products, which it shipped intrastate in the final leg of a transportation journey that it controlled from start to finish; or, by contrast, (b) the company shipping the product across state lines to a local warehouse thereafter sold the product to a different, unaffiliated entity in the

same state, which took title to the products and, in turn, sold the product to its own customers. Here, the defendants have not identified any persuasive cases in their favor relating to the latter scenario. To the contrary, albeit in *dicta*, *State of Texas*, *Collins*, and *Billings* all stated that they would have reached a different result if the interstate shipper in question had sold the goods to an independent local entity that in turn sold the goods locally to its own customers.

Essentially, Five Star takes the position that, if any entity in the chain of distribution intends to (and does) ship products across state lines, then any downstream distributors of those products to retailers necessarily intend those products to move in "interstate commerce" under the MCA. However, as *Collins*, *State of Texas*, and *Billings* indicate, the MCA does not apply that broadly, and the relevant intent of the original shipper to ship goods interstate does not reflexively apply to all shipments in the ensuing intrastate distribution of those products. *See Collins*, 589 F.3d at 898 ("[T]he language of the Motor Carrier Act - 'transported . . . between a place in a State and a place in another State' - does not indicate a congressional intention of regulating a purely intrastate shipment merely because of its effect on interstate commerce. The shipment itself must be in some sense interstate commerce (transportation between a place in a state and a place in another state).") To the contrary, circumstances matter, including whether the original shipping entity or entities controlled, either directly or through affiliates, the ultimate intrastate destination of the products during and after the products crossed state lines.

### C.   Application

Here, Vistar of Tennessee purchased goods manufactured outside of Tennessee by unidentified companies, which Five Star has not claimed were affiliated with Vistar of Tennessee or with Five Star. Vistar of Tennessee shipped those products across state lines and

16

stored the products in a warehouse in Memphis, where it apparently held title to the products. From the Memphis warehouse, Vistar of Tennessee sold products to multiple other companies, including Five Star. With respect to Five Star, Vistar of Tennessee then shipped those goods to a warehouse that Five Star owned in Nashville, Tennessee, where Five Star took title to the products – *i.e.*, an *intrastate* sale transfer of the products from one unaffiliated company to another.[9] From Five Star's Nashville warehouse, Five Star employees loaded and transported those products to Middle Tennessee locations – *i.e.*, a *second* intrastate transport of the products.

Neither the original out-of-state producers nor Vistar of Tennessee exercised control over the ultimate destination of the products. Therefore, unlike cases such as *State of Texas*, *Billings*, and *Musarra*, the company or companies that shipped the products over state lines (here, the out-of-state producers and Vistar of Tennessee) did not "retain control of the product for its entire journey." *See* 413 F. Supp. 2d at 822. Rather, Vistar of Tennessee sold the goods *within Tennessee* to Five Star pursuant to an arm's length transaction (or transactions), at which point Five Star controlled the ultimate destination of those goods. By the same token, Five Star, which is not affiliated with the out-of-state producers or Vistar of Tennessee, had no control over the products (or the companies shipping them) when the products originally crossed state lines. Furthermore, Vistar of Tennessee did not intend the products to cross state lines after it sold them to Five Star, nor did Five Star intend to move those products across state lines (say, from Nashville to Atlanta, Georgia) following the sale.

_____

[9]The court expresses no opinion as to whether the drivers who transported products from Vistar of Tennessee's Memphis warehouse to the Nashville warehouse were engaged in "interstate commerce" under the MCA, an issue that might present a closer question than circumstances at issue here.

Under the circumstances presented here, and consistent with the reasoning of *Collins*, *State of Texas*, and *Billings*, the court finds that Foreman's activities in transporting products from Five Star's Nashville warehouse to Middle Tennessee customers are not subject to the power of the Secretary of Transportation to regulate under the MCA. Again, although it is conceivable that Foreman's employment related to "interstate commerce" under the Commerce Clause, the fact that Foreman handled goods originally manufactured in another state is insufficient to constitute "interstate commerce" under the MCA.[10] The MCA governs only shipments "between a State and another State" or "between a point in a State and a point in the same State through another State." Neither of those conditions is satisfied here.

## D.    Administrative Authority Cited by the Defendants

The defendants also reference several opinion letters from the Department of Labor and a DOL Internal Operations Manual, which suggest that, under appropriate circumstances, vending machine service workers could fall within the MCA exemption to the FLSA's overtime requirements. As an initial matter, "[I]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference." *Wos v. E.M.A. ex. Rel. Johnson*, 133 S. Ct. 1391, 1402, 185 L. Ed. 2d 471 (2013) (internal quotation omitted).

---

[10]The defendants attached a copy of an unpublished and unreported federal district court decision in favor of its franchisor, Compass Group, USA. *See Kimberly Davis, et al. v. Compass Grp., USA*, Civil Action H-09-2733 (Order dated July 24, 2010). In that decision, which is distinguishable on multiple grounds, the district judge appears to have erred in concluding that (1) the MCA exemption reaches "the scope of Congress's power to regulate interstate commerce," which the judge complained "has been interpreted beyond constitutional design"; and (2) because it had found that the employee engaged in "interstate commerce" *under the FLSA*, the employee necessarily engaged in "interstate commerce" under the MCA.

18

Thus, "[t]hese documents are entitled to respect in proportion to their power to persuade." *Id.* (internal quotations omitted); *see also Watson v. Solis*, 693 F.3d 620, 624 (6th Cir. 2012).

Here, the court finds the opinion letters to be inapposite and unpersuasive. For example, in a November 26, 1971 letter, the DOL considered whether "vending machine servicemen who transport products between the company warehouse and points within the State, where such products have come to the warehouse from other States for stocking vending machines," fall within the MCA exemption to the FLSA. *See* 1971 WL 33029, WH-149 (Nov. 26, 1971). In response to that inquiry, the DOL stated, without reference to any legal authority, that "due to the unsettled nature of the law in this area," it "will not assert that section 13(b)(1) does not apply to such a situation." *Id.* Interpreting the DOL's double-negatives in this letter, the court construes the DOL's position in that letter as *non-committal*, not as an acknowledgment that the MCA exemption *did* apply to the proposed situation. Moreover, the letter does not address the case-specific circumstances presented here, in which the products at issue "came into the warehouse" from another warehouse in the same state pursuant to an arm's length transaction.

The defendants also rely on § 24c03 of the DOL's Field Operations Handbook, which states as follows: "Vending machine servicemen who transport products between a warehouse and points within the same State, where such products have been procured from other States for stocking vending machines, are engaged in the transportation of property in interstate commerce until placed in the vending machines." *Id.* As with the November 26, 1971 opinion letter, § 24c03 does not directly address the factual circumstances presented in this case. First of all, it is not clear from the Handbook what the DOL means when it refers to products "procured from other States," which is a crucial question here. Does the DOL's position assume that the entity

19

stocking the vending also *itself* shipped them across state lines, as opposed to purchasing them from an unaffiliated in-state wholesaler? The Field Operations Handbook does not say. Second, even assuming *arguendo* that the Handbook purports to address the stocking of vending machines regardless of which entity actually shipped the products across state lines, the DOL's position does not reference any legal authority for the blanket proposition cited, nor has the court identified any such authority.

In sum, on the limited record before it, the court finds that Five Star has not met its burden to show that the MCA exemption "plainly and unmistakably" applies to Foreman. Therefore, the FLSA's overtime provisions apply, and Five Star is liable to Foreman for unpaid overtime.

### E.    Remaining Issues Related to FLSA Claim

With respect to Foreman, there is a genuine factual dispute between the parties as to whether Foreman was required to work "off the clock" during his five weeks of employment as a merchandiser. As to Foreman's four weeks of work as a vending route driver, the parties appear to agree that Foreman worked overtime but was not paid premium overtime wages for it. Although Foreman filed time cards showing that he worked some amount of overtime as a vending route driver, the record does not contain a calculation of the damages owed.

With respect to plaintiff Gary Runge, the parties will need to clarify how they intend to proceed. The court has found that Five Star was obligated to pay Foreman overtime compensation under the FLSA, a ruling that, as to liability, would presumably apply with equal force to Runge. However, although Runge joined Foreman in opposition to Five Star's Motion for Summary Judgment, Runge did not join Foreman's Motion for Partial Summary Judgment.

20

Also, given that the parties have submitted relatively few facts related to Runge, it is unclear whether Runge's FLSA claim presents any disputed issues of fact for trial with respect to damages.

In light of these considerations, the court will order the parties to file a joint statement in advance of trial to clarify which issues will remain for trial.

## RETALIATORY DISCHARGE CLAIM

I.      **Facts Related to Retaliatory Discharge Claim**

When Five Star hired Foreman as a vending route driver on or about September 6, 2011, Foreman began a 90-day "probationary period" for new hires, during which time new hires were trained and evaluated. After being hired, Foreman initially shadowed a fellow vending route driver, Jeremy Spicer. In early October 2011, Five Star transferred Foreman to an Avanti Markets merchandiser position for unspecified reasons. On October 5, 2011 – either the day of Foreman's transfer or just after it – the supervisors of the Avanti merchandisers, Sarah Azarbarzin and James McDaniel, and their supervisor, Mark Stephanos, held a meeting with all of the merchandisers. At that meeting, Azarbarzin, McDaniel, and Stephanos discussed performance expectations for the merchandisers.

During the month of October 2011, Foreman underwent training as a merchandiser. For the first week, he accompanied Runge, who was scheduled to leave the position at the end of that week. For the majority of the next three weeks, Azarbarzin trained Foreman by accompanying him along the route while he serviced machines at each location. When Foreman first took the route, he informed McDaniel of serious pre-existing issues at the locations along that route (such as out-of-date products), with respect to which Foreman offered suggestions for improvement

21

that McDaniel "liked."

On October 13, 2011, Five Star held another meeting with all of the merchandisers to address issues that Five Star had identified. Five Star addressed performance issues and reiterated its expectations for the merchandisers.

According to Foreman, he had told Stephanos during his original interview that he would need to be out of work on October 14, 2011 for a "personal matter," and Stephanos expressed no issue with that request at the time. On October 13, 2011 (the same date as the general meeting with the merchandisers), Foreman reminded McDaniel that he would be taking time off the next day, at which point (according to Foreman) McDaniel became visibly upset. On October 14, 2011, Foreman in fact missed work to attend a court hearing concerning approval of his workers' compensation settlement with a previous employer. When he returned to work the next day, McDaniel was "not in the best mood" about Foreman having missed a day, and both McDaniel and Azarbarzin commented on the fact that they had needed to cover for Foreman.

According to Five Star, on October 31, 2011, Stephanos, McDaniel, and Azarbarzin held yet another meeting with the merchandisers to discuss the fact that Five Star's expectations were not being met. Five Star also contends that, immediately after the October 31, 2011 meeting with all of the merchandisers, Stephanos, McDaniel, and Azarbarzin counseled Foreman for performance deficiencies, including failure to rotate products, smoking on the job, and lack of efficiency. There is no contemporaneous written record of this meeting, Foreman denies that it ever occurred, and Foreman argues that Stephanos' testimony on this point is unclear in the first place.

On November 1, 2011, Foreman was served at home with a subpoena to testify as a

22

witness for the plaintiff in a federal discrimination case against Foreman's former employer.[11]
On or about November 2, 2011, the next day of work, Foreman gave the subpoena to Azarbarzin.
According to Foreman, Azarbarzin immediately became visibly upset, took the subpoena, and
met with McDaniel and Stephanos in Stephanos's office for 30 to 45 minutes.  After the meeting,
Azarbarzin returned and told Foreman that it would be difficult to have his route covered on
November 15, the date on which Foreman was called to testify.  According to Foreman,
Azarbarzin pressed Foreman for details about the case, even after Foreman told her that he was
not comfortable discussing the matter.  At any rate, no one at Five Star told Foreman that he
could not leave work to comply with the subpoena.

On November 4, 2011 (a Friday), two days after being notified of the subpoena,
McDaniel inspected one of the customer locations on Foreman's route.  Foreman states that he
actually witnessed McDaniel and Azarbarzin leaving this particular location as Foreman
approached it in his vehicle.  McDaniel identified multiple performance deficiencies at this
particular location and avers that he counseled Foreman about these deficiencies.  Foreman does
not appear to dispute that McDaniel actually identified issues with that particular location, but
Foreman denies receiving any counseling from McDaniel about the matter.  In fact, Foreman
contends that, before a November 7, 2011 meeting, no one at Five Star had individually
counseled him or reprimanded him for performance deficiencies; to the contrary, Foreman
maintains that McDaniel and Azarbarzin uniformly praised his work until he was terminated.

On November 7, 2011 (the following Monday), Stephanos inspected multiple locations

---

[11]Incidentally, the case was *Nijem v. Alsco*, No. 3:10-cv-00221 (M.D. Tenn. filed Mar. 5, 2010), and it settled on November 15, 2011, the date trial was scheduled to begin.  (*See Nijem* Docket No. 68; *see also Nijem* Docket No. 66, at pp. 3-4 (Foreman subpeona).)

23

on Foreman's route and observed several issues, including out of date products, empty shelves, and dirty kiosks, among other issues. Either on that date or the next morning, Stephanos and McDaniel called Peggy Russell, Five Star's Human Resources director, to report Foreman's purported performance deficiencies. At Russell's behest, on November 8, 2011, Stephanos sent a follow-up email (copying McDaniel and Azarbarzin) purporting to recount his efforts to counsel Foreman. That email stated as follows:

> Peggy:
>
> Here are the dates for the discussions with John Foreman:
>
> Wednesday, October 5, 2011
>
> Thursday, October 14, 2011
>
> Friday, October 31, 2011
>
> Attendees at meeting: Mark Stephanos, Sarah Azarbarzin, James McDaniel
>
> Verbal warning issued; John was told at all 3 meeting [sic] that all markets were to be clean and fill properly [sic] daily with no out of date issues. Special attention to keeping the markets full at all times was essential for the success of our Avanti program. John was told that he was being given an opportunity to work in Avanti on a trial basis to she [sic] how he performed. At all 3 meetings with John these same topics were discussed. We also had found out of date products in his markets and he was warned that out of date products were unacceptable. John was also warned about not taking frozen food products to his assigned market as empty conditions were evident.

(Docket No. 41, Attachment No. 1.) Construing this email in the light most favorable to Foreman, the email gave Russell the misleading impression that Foreman, Stephanos, Azarbarzin, and McDaniel had counseled Foreman *individually* on the referenced dates ("the meetings with John"), when in fact Foreman had merely been present at meetings involving *all* of the merchandisers. Russell admitted at deposition that supervisors at Five Star generally

24

"counsel" employees in private.

Five Star has a progressive discipline process that is mandatory for non-probationary employees and, according to the Five Star employee handbook, only optional for probationary employees. Under the progressive discipline process, an employee receives a verbal warning, followed by a written warning, and then a final written warning. Russell was aware of probationary employees who had been progressively disciplined. However, for unspecified reasons, Foreman was not progressively disciplined before his termination. Also, the record contains no contemporaneous documents indicating that Foreman ever received a verbal or written warning. Thus, as to whether Foreman was ever individually "counseled" before November 7, 2011, it is essentially Foreman's word against Five Star's.

On November 8, 2011, with Russell's approval, Stephanos terminated Foreman.

## II. LEGAL STANDARD FOR TENNESSEE RETALIATORY DISCHARGE CLAIM

In Tennessee, the general rule is that an at-will employee may be fired for good cause, bad cause, or no cause. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 574 (Tenn. 1999). However, Tennessee recognizes a common law exception to that doctrine for retaliatory discharge in violation of public policy. *See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716-717 (Tenn. 1997); *Chism v. Mid-S. Milling Co.*, *Inc.*, 762 S.W.2d 552, 555 (Tenn. 1998); *Crews v. Buckman Labs. Int'l*, 78 S.W.3d 852, 858 (Tenn. 2002). "[A] claim for retaliatory discharge in violation of public policy lies in cases where a substantial factor in an employer's decision to terminate an employee is the fact that the employee honored a lawful subpoena." *Willard v.*

*Golden Gallon-Tn., LLC*, 154 S.W.3d 571, 577 (Tenn. Ct. App. 2004).[12]

To prevail on a claim for retaliatory discharge, a plaintiff must show: (1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy. *Crews*, 78 S.W.3d at 862. Here, Five Star argues that Foreman cannot establish the latter two elements, which essentially comprise the causation element of a retaliatory discharge claim.

In analyzing the retaliatory discharge claim, the parties agree that the court must apply a burden-shifting analysis,[13] under which Foreman must state a *prima facie* case of retaliatory

---

[12]*Willard* specifically dealt with the issuance of a Tennessee state court subpoena. Five Star does not dispute that *Willard* must apply with equal force to discharging an employee for complying with a federal subpoena. Indeed, as with Tennessee trial subpoenas, federal trial subpoenas further important policy interests and carry attendant criminal sanctions for their willful violation. *See, e.g.*, 18 U.S.C. § 401 (general contempt statute); 28 U.S.C. § 1826(a) (Recalcitrant Witness Statute).

[13]In *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 799 (Tenn. 2010), the Tennessee Supreme Court announced that the *McDonnell Douglas* framework was not appropriate for Tennessee courts to apply to common law retaliatory discharge claims because that framework was inconsistent with Tenn. R. Civ. P. 56. *See also Kinsler v. Berkline*, 320 S.W.3d 796 (Tenn. 2010). The decision temporarily created some ambiguity as to which summary judgment standard should apply in federal cases involving Tennessee statutory and common law retaliatory discharge claims, although several federal courts found that *Gossett* merely articulated a procedural rule that was not binding on federal courts. *See, e.g.*, *Reed v. Inland Intermodel Logistics Servs., Inc.*, No. 09-2607, 2011 WL 4565450, at *5-*7 (W.D. Tenn. Sept. 29, 2011) (applying *McDonnell Douglas* framework to Tennessee Human Rights Act ("THRA") claim). In 2011, the Tennessee legislature effectively abrogated *Gossett* by clarifying that burden-shifting was appropriate for statutory retaliatory discharge claims, thereby mooting the issue in later-filed

26

discharge, at which point the burden of production shifts to Five Star to show a legitimate, non-pretextual reason for Foreman's discharge. The burden then shifts to Foreman to show that Five Star's proffered reason for the discharge was merely a pretext for its unlawful motive.

Foreman has satisfied his *prima facie* burden. Five Star terminated Foreman within five days of learning that he intended to comply with a lawful subpoena. Viewing the remaining facts in the light most favorable to Foreman, the supervisors who received the subpoena reacted negatively, suspiciously discussed the subpoena in a private meeting for 30-45 minutes after receiving it, failed to counsel Foreman individually before his termination, and made a misleading communication to Russell, who authorized Foreman's termination based on that misleading information. This evidence is sufficient to shift the burden to Five Star to produce a legitimate reason for terminating Foreman that is unrelated to his attempt to comply with a lawful subpoena.[14]

_____

cases involving those types of claims. *See Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.* Nos. 10-6101, 11-5174, 2012 WL 4945607, at *19 (6th Cir. Oct. 18, 2012) (citing *Bobo v. United Parcel Serv.*, 665 F.3d 741, 757 (6th Cir. 2012)). It does not appear that the Tennessee Supreme Court has yet addressed whether burden-shifting remains appropriate in Tennessee courts for common law retaliatory discharge claims. At any rate, the parties here both agree that the burden-shifting framework applies to Foreman's common law retaliatory discharge claim, so the court will apply that framework here. Even if the court applied the *Gossett* framework, the court would reach the same result.

[14]Five Star has not responded to Foreman's contention that, under Tennessee law, temporal proximity alone is sufficient to establish the causation element of his *prima facie* burden. *See Allen v. McPhee*, 240 S.W.3d 803, 819 (Tenn. 2007); *Kinsler v. Berkline, LLC*, No. E2007-02602-COA-R3-CV (Tenn. Ct. App. 2008), *aff'd* 320 S.W.3d 796 (Tenn. 2010). If that is the case, it raises the possibility that the *prima facie* burden for Tennessee retaliatory discharge claims may differ from the *prima facie* burden for federal retaliatory discharge claims (*e.g.*, under Title VII), which could complicate a burden-shifting analysis involving parallel state and federal claims. The court need not address whether temporal proximity alone would suffice here, because multiple facts other than temporal proximity support Foreman's retaliatory discharge claim.

27

In response to Foreman's *prima facie* case, Five Star argues that it terminated Foreman solely because of performance deficiencies that had nothing to do with Foreman's requesting a day off to testify in a federal discrimination case. Therefore, Five Star has the met its burden of production to offer a legitimate, non-pretextual reason for Foreman's termination.

In response, Foreman argues that Five Star's stated basis for terminating him was a pretext engineered by his superiors to retaliate against him for intending to comply with the federal subpoena. Five Star maintains that Foreman has presented "no evidence" other than "self-serving testimony" to support his pretext argument. The court disagrees, particularly where the same could be said of the defendants' evidence, which largely consists of self-serving testimony by the supervisors whom Foreman now accuses of misconduct. Viewing the facts in the light most favorable to Foreman and resolving factual disputes in his favor, the supervisors twice reacted negatively when Foreman alerted them that he needed to leave work for court-related matters. Before he alerted them to the federal court subpoena, the supervisors did not criticize his work or specifically counsel him for any performance deficiencies. When he alerted them to the subpoena (over which he had no control), they suspiciously met for 45 minutes to discuss it, expressed displeasure that he needed to miss work to comply with the subpoena, and pressed him for information about the underlying case. From Foreman's perspective, the supervisors then performed an unannounced inspection of his route in an effort to "gin up" a basis to fire him. Stephanos, copying both McDaniel and Azabarzin, then sent an arguably misleading email to Russell, which created the false impression that Foreman had been "counseled" individually on three prior occasions for performance deficiencies. Furthermore, even though Five Star supervisors are encouraged to document counseling of subordinates, the

28

supervisors did not document their alleged "counseling" of Foremen on these dates, nor did Five Star utilize its (optional) progressive discipline for probationary employees before terminating Foreman.

Five Star does not dispute the recognized principle that acting through a "cat's paw" does not insulate an employer from liability. Under that doctrine, a supervisor's improper animus can be imputed to a decisionmaker where (1) the supervisor intended to cause an adverse employment action; and (2) the supervisor's discriminatory action is a proximate cause of the ultimate employment action. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012). Thus, here, even if Russell were none the wiser when she authorized Foreman's termination, Five Star could still be held liable if Stephanos, Azarbarzin, and/or McDaniel engineered Foreman's discharge based on an unlawful motive.

Taken cumulatively, the court finds that, viewed in the light most favorable to Foreman, the facts present potentially compelling circumstantial evidence from which a factfinder could conclude that Five Star's stated basis for firing Foreman was actually a pretext to fire Foreman for intending to miss a day of work to comply with a federal subpoena. Thus, there is a genuine dispute of material fact that precludes summary judgment on Foreman's retaliatory discharge claim.

## CONCLUSION

For the reasons stated herein, Foreman's Motion for Partial Summary Judgment will be granted and Five Star's Motion for Summary Judgment will be denied. Foreman's retaliatory discharge claim will remain for trial. By July 15, 2013, the parties shall file a joint statement that specifies which issues, if any, remain for trial as to the FLSA claims by Foreman and Runge.

29

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

30